UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MARQUETTE COUNTY ROAD COMMISSION,

        Plaintiff,

                                    File No. 2:15-CV-93

v.

                                      HON. ROBERT HOLMES BELL

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, et al.,

        Defendants.

_____/

## OPINION

       This is an action for declaratory and injunctive relief filed by Plaintiff Marquette County Road Commission ("MCRC") against the United States Environmental Protection Agency ("EPA"), Susan Hedman (in her capacity as Administrator of Region V of the EPA), and the United States Army Corps of Engineers ("Corps"), pursuant to the Clean Water Act (CWA), 33 U.S.C. §§ 1251 et seq., and the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 et seq. Before the Court is Defendants' motion to dismiss (ECF No. 13) and Plaintiff's motion for discovery (ECF No. 25). For the reasons stated herein, Defendants' motion to dismiss will be granted and Plaintiff's motion for discovery will be denied.

## I. Background

       Plaintiff intends to fill 25 acres of wetlands in order to construct a road in Marquette County. To do so, it needs a permit under section 404 of the CWA. As the Sixth Circuit has explained:

> The Federal Water Pollution Control Act ("FWPCA"), 33 U.S.C. §§ 1251-1376, enacted in 1972, constituted a reconstruction of America's water pollution laws. Pursuant to the FWPCA, the discharge of pollutants into our nation's waterways is prohibited unless authorized by a permit or exempted by the specific statutory language.
>
> The Act establishes two discrete permitting systems by which individuals might obtain permits from the appropriate federal agency allowing dumping in waterways. The first, which is known as the National Pollutant Discharge Elimination System ("NPDES"), governs the discharge of pollutants from specific sites, known as point sources, *see* § 402 of the FWPCA, 33 U.S.C. § 1342, and most typically affects industry sources. The second permitting scheme, which operates under the Secretary of the Army via the Army Corps of Engineers, regulates the release of dredged and fill matter into waterways, including wetlands. *See* § 404 of the FWPCA, 33 U.S.C. § 1344. The two permitting systems are commonly referred to as "the § 402 system" and "the § 404 system," respectively.

*Friends of Crystal River v. EPA*, 35 F.3d 1073, 1074-75 (6th Cir. 1994).

Plaintiff sought its permit from the Michigan Department of Environmental Quality ("MDEQ"), which is the state agency responsible for implementing Michigan's federally-approved CWA wetland permit program.

> States are authorized to supplant the first federal permitting scheme, the NPDES scheme, pursuant to various provisions of the FWPCA. Additionally, the Clean Water Act of 1977, ("CWA"), passed in 1977, which strengthened the FWPCA by adding additional protections, provides a similar authority to the states with respect to § 404 permits. . . .
>
> Under § 404 a state may establish its own permitting system by complying with the process enumerated therein. Limited federal oversight authority is retained even after the state's acquisition of permitting control. Pursuant to this retained oversight authority, a state is required to present to the EPA copies of all permit applications which are submitted to the state for approval. In addition, the state must notify the EPA of any action that it takes with respect to such applications. § 1344(j). The EPA Administrator must, within 10 days, provide copies of the application to the Army Corps, the Department of the

2

> Interior, and the Fish and Wildlife Service. The state must be notified within thirty days if the Administrator intends to comment on the state's handling of the application. *Id.* The administrator's comments must be submitted within ninety days. *Id.*

*Friends of Crystal River*, 35 F.3d at 1075 (footnotes omitted).

Plaintiff submitted its initial application to the MDEQ in October 2011, and a revised application on January 23, 2012. The MDEQ sent copies of the application to the EPA, the Corps, and the United States Fish and Wildlife Service ("FWS"). On April 23, 2012, after consulting with the Corps and the FWS, the EPA submitted comments on the application and objected to issuance of a permit, asserting that Plaintiff's proposal failed to comply with section 404 of the CWA, 33 U.S.C. § 1344, and the 404(b)(1) guidelines, 40 C.F.R. §§ 230.1 et seq., because, among other things, it did not demonstrate that the proposed road was the "least environmentally damaging practical alternative." (Ex. 19,[1] 4/23/2012 EPA letter, ECF No. 6-5.)

> Once a state is notified that the EPA intends to comment, it may not issue the permit until after it has received the comment, or until ninety days have passed. If the EPA objects to the application, the state "shall not issue such proposed permit" even after the ninety days have elapsed. [33 U.S.C. § 1344(j).] The aggrieved state may request a hearing to air its complaints. However, if the state does not request a hearing, or if it fails to modify its plan so as to conform to the EPA's objections, authority to issue the permit is transferred to the Army Corps.

*Friends of Crystal River*, 35 F.3d at 1075 (footnote omitted).

---

[1]All references to exhibits in this Opinion ("Ex. __") refer to exhibits attached to the complaint.

Over the next several months, Plaintiff, the MDEQ, and the EPA discussed the application. Plaintiff submitted a second revised application on June 29, 2012, and a third revised application on July 24, 2012. At the MDEQ's request, the EPA held a public hearing on the third revised application on August 28, 2012. On September 17, the MDEQ notified the EPA that "it would soon be in a position to issue a permit under state authorities," and urged the EPA to withdraw its objections. (Compl. ¶ 262, ECF No. 1.) Plaintiff subsequently revised its wetland mitigation plan.

On December 4, 2012, the EPA notified the MDEQ that it was withdrawing some objections, but that it continued to object to the issuance of the permit because it did not believe that Plaintiff had provided "adequate plans to minimize impacts" or a "comprehensive mitigation plan that would sufficiently compensate for unavoidable impacts." (*Id.* ¶ 265.) The EPA informed the MDEQ that the state had 30 days to either issue a permit which satisfied the EPA's objections or to notify the EPA of its intention to deny the permit. *See* 40 C.F.R. § 233.50(h)(2). Between December 4 and December 27, 2012, Plaintiff "repeatedly" contacted the EPA to obtain more specific information about the objections and the conditions necessary to satisfy them. (Compl. ¶ 271.) It did not receive the information that it desired. Instead, the EPA told Plaintiff to work with the MDEQ. On December 27, 2012, Plaintiff sent the MDEQ a detailed letter responding to the EPA's concerns and asking the state to issue a permit. (Ex. 44, MCRC letter, ECF No. 8-12.)

4

On January 3, 2013, the MDEQ notified the EPA that, although it was working with Plaintiff to address the EPA's objections, it would not issue a permit because of "the short time frame allowed by statute and the complexity of the issues remaining." (Ex. 45, MDEQ letter, ECF No. 8-13.) The MDEQ acknowledged that, per section 404 of the CWA, "authority to process the permit application . . . is now transferred to the [Corps]." (*Id.*)

Thereafter, the Corps told Plaintiff that it would not issue a permit based on the third revised application submitted to the MDEQ. (Compl. ¶ 299.) Rather, in order to proceed, Plaintiff would need to submit a new application to the Corps. (*Id.*) Plaintiff declined to do so. (*Id.* ¶ 301.)

Plaintiff subsequently brought this five-count declaratory judgment action. In Count I of the complaint, Plaintiff claims that the EPA's objections to its permit application were arbitrary and capricious. In Count II, Plaintiff claims that the EPA exceeded its delegated authority by issuing objections based on requirements that are not mandated by the CWA. In Count III, Plaintiff claims that the EPA's objections failed to list the conditions necessary for a permit to issue, as required by section 404(j) of the CWA. In Count IV, Plaintiff claims that the EPA did not follow the procedural requirements of section 404(j) of the CWA. In Count V, Plaintiff claims that the Corps improperly denied its permit application by failing to act on it.

Defendants assert that the complaint should be dismissed pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, because the complaint fails to state a

claim upon which relief can be granted and because the Court lacks subject matter jurisdiction to adjudicate the claims against the EPA.

## II. Jurisdiction

Defendants contend that the Court lacks subject matter jurisdiction over the claims against the EPA. Their core objection to these claims is that the EPA's actions are not reviewable because they do not constitute a "final agency action" under the APA. *See* 5 U.S.C. § 704. As the Sixth Circuit has explained, however, "[t]he APA is not a jurisdiction-conferring statute; it does not directly grant subject matter jurisdiction to the federal courts." *Jama v. Dep't of Homeland Sec.*, 760 F.3d 490, 494 (6th Cir. 2014). Consequently, the "final agency action requirement" of the APA is not jurisdictional. *Id.* at 494 n.4. Rather, the Court's jurisdiction stems from the federal question statute, 28 U.S.C. § 1331, which "'confer[s] jurisdiction on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional predicate.'" *Id.* at 494 (quoting *Califano v. Sanders*, 430 U.S. 99, 105 (1977)); *see also Hill v. Norton*, 275 F.3d 98, 103 (D.C. Cir. 2001) (noting that "challenges brought under the APA fall within the reach of the general federal jurisdiction statute, 28 U.S.C. § 1331").

Plaintiff seeks review of agency action under the APA. The Court has subject matter jurisdiction to review Plaintiff's claims under 28 U.S.C. § 1331. Thus, the Court will not dismiss any claims for lack of subject matter jurisdiction, but will review them to determine whether they state a viable cause of action.

### III. Standard of Review

In reviewing a Rule 12(b)(6) motion to dismiss, the Court must "'construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff,'" but it "'need not accept as true legal conclusions or unwarranted factual inferences.'" *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 992 (6th Cir. 2009) (quoting *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008)). A complaint must contain "a short and plain statement of the claim showing how the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of this statement is to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The complaint need not contain detailed factual allegations, but it must include more than labels, conclusions, and formulaic recitations of the elements of a cause of action. *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts that "state a claim to relief that is plausible on its face," and that, if accepted as true, are sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

### IV. Finality and EPA objections

Section 704 of the APA authorizes judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court. . . ." 5 U.S.C. § 704. Neither party contends that the EPA's actions have been made reviewable by statute. Defendants assert that Plaintiff does not state a viable claim against the EPA because the EPA's actions do not constitute a "final agency action." The Court agrees.

The Court must apply a "two-prong test" to determine whether agency action is "final":

> First, the action must mark the "consummation" of the agency's decisionmaking process–it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."

*Jama*, 760 F.3d at 495-96 (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citations omitted)); *see also Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) ("The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties."). "An agency action is not final if it 'does not of itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action.'" *Jama*, 760 F.3d at 496 (quoting *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939)).

At issue in this case is whether the EPA's issuance of objections to a section 404 permit to be issued by a state constitutes a final agency action. The Sixth Circuit touched on

this question in *Friends of Crystal River*, noting cases which "stand for the broad proposition that an EPA decision to object does not constitute final agency action" and "may [not] be subjected to judicial review." 35 F.3d at 1079 (referring to *American Paper Inst. v. EPA*, 890 F.2d 869, 875 (7th Cir. 1989) (finding that the EPA's decision to object to a section 402 permit was not reviewable because it was a discretionary act); and *Champion Int'l Corp. v. EPA*, 850 F.2d 182 (4th Cir. 1988) (finding that the EPA's unsatisfied objections are not final agency actions, and thus are not reviewable)). In *American Paper*, the Seventh Circuit reasoned that the EPA's decision to object is not reviewable because it is discretionary, but the Sixth Circuit stated that a "more defensible basis for determining EPA objections to be non-reviewable lies in the fact that such decisions are non-final. For example, the EPA may, after issuing an objection, decide to (1) accept the modified state permit; (2) issue a permit on its own; or (3) deny the permit." *Id.* at 1079 n.11.

The foregoing discussion in *Friends of Crystal River* is dictum, because the Sixth Circuit was not asked to review objections to a section 404 permit. In that case, as in this one, a party sought a section 404 permit from the State of Michigan and the EPA objected. *Id.* at 1076. Also, like this case, the EPA and the state could not resolve their objections within the applicable time frame, so permitting authority transferred to the Corps. *Id.* Unlike this case, however, the EPA subsequently withdrew its objections and attempted to have permitting authority transferred back to the state. *Id.* at 1077. The plaintiffs filed suit, challenging the EPA's attempt restore state control over the permitting process. They did not challenge the

9

objections themselves. The court determined that review of the EPA's withdrawal of objections and purported transfer of permitting authority to the state was appropriate because it was a "final, non-discretionary act" that, "if unreviewed, will terminate the federal government's role in th[e] case." *Id.* at 1079.

Although it is not binding, the Court agrees with the discussion in *Friends of Crystal River* regarding the reviewability of EPA objections. As discussed in more detail below, under the first prong of the *Bennett* analysis, those objections do not mark the consummation of its decisionmaking process. After issuing objections, the EPA continues to work with the state to fashion an appropriate permit, and the EPA could decide to withdraw the objections or accept a modified permit. In addition, under the second prong of the *Bennett* analysis, the EPA's objections do not impose new legal consequences or determine the rights or obligations of the permit applicant. The state must decide whether to deny the permit application or to issue a modified permit. If the state does not do so, the applicant can seek a permit from the Corps, without being bound by the EPA's objections.[2]

**1. EPA objections do not mark the consummation of the agency decisionmaking process.**

Under the first *Bennett* prong, the EPA's objections do not mark the "consummation" of its decisionmaking process. As it did in this case, the EPA continues to work with the state and the permit applicant after issuing objections. It has authority to modify or withdraw those

_____

[2]The CWA does not render EPA objections to a state permit binding on the Corps.

objections in response to hearings or further information the state or the applicant. But for the lapse in the time provided by the statute and its implementing regulations,[3] the EPA could have continued to work with the state to fashion an acceptable permit. Even after permitting authority transferred to the Corps, the EPA's objections were still "tentative" and "interlocutory" in nature because the Corps can issue a permit on the terms requested by Plaintiff, notwithstanding any objections raised by the EPA. Unlike the situation in *Crystal River*, the EPA's action did not terminate the federal government's role in the matter.

In the parallel context of section 402 permits, several courts have indicated that EPA objections are not final. *See American Paper Inst.*, 890 F.2d at 875; *Champion Int'l Corp.*, 850 F.2d at 188 ("Since the EPA clearly intends to continue the administrative process and ultimately issue or deny a permit to Champion, its objection and assumption of issuing authority are not final actions subject to judicial review . . . ."); *see also City of Ames v. Reilly*, 986 F.2d 253, 255-56 (8th Cir. 1993) ("Various administrative opportunities still remain: the State could issue its own permit, the EPA could withdraw its objections, or the EPA could issue a final NPDES permit."); *Westvaco Corp. v. EPA*, 899 F.2d 1383, 1389 (4th Cir. 1990) (noting that EPA objections to section 402 permits are not final).

---

[3]Plaintiff asserts that the EPA improperly allowed the state only 30 days to respond to its final objection on December 4, 2012, but the statute requires the state to submit a revised permit within 30 days after the public hearing, which occurred on August 28, 2012. 33 U.S.C. § 1344(j). Plaintiff does not allege that the state did so. EPA regulations are more forgiving; they allow the state to issue a revised permit within 30 days after receiving notification that the EPA is not withdrawing its objection. 40 C.F.R. § 233.50(h)(2). Unless Plaintiff is challenging the EPA's regulations, the EPA's 30-day requirement was not improper.

Before the FWPCA was amended in 1977, EPA objections to a state discharge permit under section 402 were found to be reviewable under 33 U.S.C. § 1369(b)(1)(F) (providing for review of EPA actions in "issuing or denying any permit") because, in effect, the objections functioned as a veto or denial of the permit. *See Crown Simpson Pulp Co. v. Costle*, 445 U.S. 193, 196 (1980); *Ford Motor Co. v. EPA*, 567 F.2d 661, 668 (6th Cir. 1977). Plaintiff cites case law relying on this authority. *See Pa. Mun. Authorities Ass'n v. Horinko*, 292 F. Supp. 2d 95, 105 (D.D.C. 2003) ("In general, EPA objections or modifications to permits have been found to be final agency action.") (citing *Crown Simpson*). However, the 1977 amendments gave the EPA authority to issue the permit after its objections were not resolved by the state. These amendments call into question the case law relied upon by Plaintiff, because "an EPA objection to a state permit is no longer 'functionally similar' to denying a permit." *Am. Paper Inst.*, 890 F.2d at 874; *accord Envtl. Protection Info. Center v. Pacific Lumber Co.*, 266 F. Supp. 2d 1101, 1113 n.10 (N.D. Cal. 2003).

The permitting scheme for discharge permits under section 402 is similar to that for dredge-and-fill permits under section 404. As with permits under section 404, a state can obtain approval to issue permits under section 402. *See* 33 U.S.C. § 1342(b). In addition, the state's authority to issue the permit is subject to EPA oversight: the EPA receives notice of permit applications and can object to the issuance of a permit. *Id.* § 1342(d). After an objection is raised, the state has the opportunity to request a hearing; if the state does not submit a revised permit that satisfies the EPA's objections within 30 days after the hearing,

12

or within 90 days after the objection (if no hearing is requested), then permitting authority passes from the state to the EPA. *Id.* § 1342(d)(4).

Plaintiff notes that there is a difference between the 402 process and the 404 process: the EPA assumes authority to issue a section 402 permit when the state cannot resolve the EPA's objections within the available time frame, whereas the Corps assumes authority to issue a section 404 permit when the state cannot resolve the EPA's objections within the available time frame.[4] But if the EPA's objections are not final in the section 402 context, it does not stand to reason that they would be final in the section 404 context. In both cases, the state has an opportunity to resolve the EPA's objections and issue the permit, and if the state does not do so, the applicant can seek the permit from the appropriate federal agency. In both cases, a federal agency will then make a final determination whether to issue or deny the permit, without being bound by the EPA's objections, and that decision can be reviewed in court. Thus, in both cases, the EPA's objections are an interlocutory step in the permitting process rather than the consummation of that process.

Nevertheless, Plaintiff asserts that the EPA's unresolved objections to a section 404 permit are final *with respect to the EPA* because they are the EPA's final word on the matter.

---

[4]It might be more accurate to say that the EPA and the Corps "re-assume" their respective permitting authorities under section 402 and section 404. Although a state can obtain approval to administer a program for issuing discharge permits under section 402, Congress intended the EPA to have authority over such permits. *See* 33 U.S.C. § 1342(a). Likewise, although a state can obtain approval to administer a program for issuing dredge-and-fill permits under section 404, Congress intended the Corps to have authority over such permits. *See* 33 U.S.C. § 1344(a). Applicants in states which have not obtained approval to administer their own permitting program must apply directly to the EPA or to the Corps, as applicable.

According to Plaintiff, after permitting authority transfers to the Corps, there is nothing left for the EPA to do. Plaintiff draws on language from *Michigan Peat v. EPA*, 175 F.3d 422 (6th Cir. 1999), in which the EPA initially objected to a state permit but then withdrew its objections and agreed to it. According to the court, "the logical conclusion is that the EPA's action was final. Statutorily, there was nothing left for the EPA to do . . . ." *Id.* at 428.

*Michigan Peat* is distinguishable because Plaintiff's permit was not granted or denied. There is no question that the grant or denial of a permit is a final, reviewable decision. Moreover, it is not the case that there is nothing left for the EPA to do after it issues its objections. It can withdraw them or work with the state to resolve them. Even after permitting authority transfers to the Corps, the EPA continues to play a role. Section 404(b) requires that a permit issued by the Corps specify the disposal sites for dredged or fill material. Section 404(c) permits the EPA "to prohibit the specification . . . of any defined area as a disposal site . . . *whenever he determines*, after notice and opportunity for public hearings, that the discharge of such materials into such area . . . will have an unacceptable adverse effect . . . ." 33 U.S.C. § 1344(c) (emphasis added); *see also* 33 C.F.R. § 323.6(b) (implementing § 1344(c)). Thus, the EPA maintains *statutory* authority to object to the permit's specification of a defined area as a disposal site. In addition, when the Corps reviews a permit application, it is likely to seek input from the EPA, just as the EPA sought advice from the Corps when reviewing Plaintiff's state permit application. *See* 33 C.F.R.

14

§ 384.5 (noting that Corps officials consult with and seek advice from all other substantially affected federal agencies).

Plaintiff also relies on *Sackett v. EPA*, 132 S. Ct. 1367 (2012), in which the EPA issued a compliance order asserting that the plaintiffs illegally filled wetlands in violation of the CWA. *Id.* at 1369. The order directed the plaintiffs to immediately undertake to restore the site in accordance with an EPA plan. *Id.* at 1371. The plaintiffs requested a hearing but the EPA denied their request. *Id.* The Court concluded that the compliance order was a final, reviewable action. *Id.* at 1374. As to the first prong of the *Bennett* analysis, the Court determined that the order marked the "consummation" of the agency's decisionmaking process because the findings and conclusions in the order were not subject to further agency review. *Id.* at 1372. Unlike *Sackett*, the EPA's determination in Plaintiff's case is subject to further agency review. The Corps is not bound by the EPA's objections; it can consider them and determine whether a permit is warranted and on what terms.

When determining whether the EPA's action was one "for which there is no other adequate remedy in a court," 5 U.S.C. § 704, the Court in *Sackett* rejected the government's argument that an adequate remedy for the plaintiffs would have been to seek a permit from the Corps and then seek judicial review of that decision if the Corps denied the permit. *Sackett*, 132 S. Ct. at 1372. According to the Court, "[t]he remedy for denial of action that might be sought from one agency does not ordinarily provide an 'adequate remedy' for action already taken by another agency." *Id.* Plaintiff uses the foregoing statement to support its

15

argument that the EPA's objections are final. According to Plaintiff, the availability of a permit from another agency (the Corps) is not an adequate remedy and does not render the EPA's actions non-final. This argument takes the Supreme Court's statement out of context. The Court was discussing the adequacy of available remedies, not the finality of the EPA's compliance order. It had already determined that the order was a final action. Thus, Plaintiff's reliance on the *Sackett* decision is misplaced.[5]

Plaintiff also contends that the mere possibility that another agency (i.e., the Corps) could take action to approve its permit in the future should not preclude review of the EPA's actions. The cases that it cites for this proposition, however, involve either the uncertain possibility of some future, discretionary action to address what has already occurred,[6] or a

---

[5]Plaintiff also cites *Role Models America, Inc. v. White*, 317 F.3d 327, 331 (D.C. Cir. 2003) ("To be final, an action need not be 'the last administrative [action] contemplated by the statutory scheme.'") (quoting *Envtl. Def. Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 590 n.8 (D.C. Cir. 1971). *Role Models* is distinguishable because the agency's decision in that case bound itself to convey property. The EPA's objections do not bind itself or the Corps in further proceedings. *Ruckelshaus* is distinguishable because the agency's refusal to suspend registrations of pesticides determined substantial rights and threatened irreparable harm. 439 F.2d at 590 n.8. No substantial rights have been determined in Plaintiff's case; its permit has not been granted or denied. Plaintiff also cites *Mountain States Tel. & Tel. Co. v. FCC*, 939 F.2d 1021, 1027 (D.C. Cir. 1991) ("An order may be final though it is not the very last step in the administrative process, but it is not final if it 'remains tentative, provisional, or contingent, subject to recall, revision, or reconsideration by the issuing agency.' The bar to review of nonfinal orders 'reflect [s] the reasoned policy judgment that the judicial and administrative processes should proceed with a minimum of interruption.'"). *Mountain States* supports the EPA's position, because the EPA's objections are subject to recall and reconsideration in proceedings before the Corps.

[6]*See U.S. Air Tour Ass'n v. FAA*, 298 F.3d 997, 1013 (D.C. Cir. 2002) (uncertain possibility that the FAA could change its rules); *Grand Canyon Trust v. Williams*, 38 F. Supp. 3d 1073, 1078 (D. Ariz. 2014) (other agencies could evaluate the Forest Services's determination, in their discretion).

refusal by the agency to reconsider its position.[7] In contrast, if Plaintiff pursues a proper permit application with the Corps, it is certain to obtain a final, reviewable decision on the merits of that application, including the merits of any issues raised by the EPA. The Corps does not have discretion to ignore such an application.

**2. EPA objections do not conclusively determine Plaintiff's rights or obligations, or impose legal consequences.**

EPA objections also fail under the second prong of the *Bennett* analysis, because they do not conclusively determine Plaintiff's rights or obligations, and their issuance is not an action from which legal consequences will flow. Unlike the plaintiffs in *Sackett*, Plaintiff is not subject to immediate consequences from the EPA's objections. The compliance order in that case required the plaintiffs to promptly restore the property according to an EPA plan and to give the EPA access to site records and documentation. *Sackett*, 131 S. Ct. at 1371-72. If they failed to do so, they could be subject to double penalties in a future enforcement proceeding. *Id.* at 1372. In contrast, the EPA's objections did not require Plaintiff to do anything that it was not already required to do. The objections appear to have prolonged the administrative process that Plaintiff started, but should Plaintiff decide to continue that process, it can do so by seeking a permit from the Corps.

Plaintiff relies on *Alaska Dep't of Environmental Conservation v. EPA*, 540 U.S. 461 (2004), in which the EPA issued three compliance orders after a state agency issued a permit

---

[7]*See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478-79 (2001) (EPA refused to reconsider its interpretation in subsequent rulemaking).

under the Clean Air Act. *Id.* at 480-81. The compliance orders prohibited the state agency from issuing the permit unless certain conditions were met, and prohibited the applicant from beginning construction. *Id.* The Supreme Court noted the EPA's concession that these orders met the finality requirement, because the EPA had asserted its "final position" on the state permit, and because the compliance orders "imposed new legal obligations on" the party subject to them. *Id.* at 481 n.10. Among other things, the applicant would not be able to escape the "lost costs and vulnerability to penalties . . . of any [state]-permitted construction" that it endeavored. *Id.* at 483. In contrast, the EPA's objections to Plaintiff's permit application did not impose new legal obligations on Plaintiff. Plaintiff was required to obtain a dredge-and-fill permit before the EPA objected, and it is still required to do so. Moreover, unlike that case, the state never issued a permit, and the EPA's actions do not prevent Plaintiff from obtaining one. Thus, as far as its legal obligations are concerned, Plaintiff remains in essentially the same position that it was in before it applied for a permit. What has changed is that authority to issue the federal permit has transferred from a state agency to a federal one.

Plaintiff argues that this transfer of authority has "fundamentally alter[ed] the substantive legal regime to which [it] is now subject." (Pl.'s Resp. in Opp'n to Mot. to Dismiss 19, ECF No. 23.) Plaintiff notes that Michigan's section 404 permit program expressly incorporates Michigan statutes and regulations, *see* 40 C.F.R. § 233.70 (listing the statutes and regulations incorporated by reference into Michigan's section 404 permit

18

program), whereas a permit application submitted to the Corps is processed pursuant to the Corps' "vaguely worded" regulations. (Pl.'s Resp. 19.) Plaintiff also notes that the Corps' regulations are substantively different from the requirements of Michigan's section 404 permit program. For instance, the two programs define the term "wetland" differently. *Compare* Mich. Comp. Laws § 324.30301(m) *with* 33 C.F.R. § 328.3(c)(4). They also set forth different "public interest" factors. *Compare* Mich. Comp. Laws § 324.30311 *with* 33 C.F.R. § 320.4.

The substantive differences identified by Plaintiff are attributable to the fact that the federal government and the State of Michigan each have their own, separate and independent clean water regulations. *See United States v. Rapanos*, 376 F.3d 629, 646 (6th Cir. 2004) (discussing the differing definitions of wetlands under Michigan and federal law), *overruled on other grounds in Rapanos v. United States*, 547 U.S. 715 (2006). But Plaintiff is always required to comply with *both* sets of regulations. Even when Michigan has authority to grant a federal permit, the requirements of state law do not supplant those in the CWA. *Id.* at 647. CWA regulations expressly state that "[a]ny approved State Program shall, at all times, be conducted in accordance with the requirements of the Act and of this part. While States may impose more stringent requirements, they may not impose any less stringent requirements for any purpose." 40 C.F.R. § 233.1(d). Thus, regardless of whether the state or the Corps issues the CWA permit, Plaintiff is subject to the same legal obligations. In both scenarios, it must comply with both state and federal requirements.

19

Plaintiff also notes that there are procedural differences when obtaining a permit from the Corps rather than the state. Michigan regulations provide for shorter response times when a permit application is under state review compared to what is set forth in the Corps' regulations. In addition, when the Corps is responsible for issuing a permit, its decision is subject to the lengthy and costly review process laid out by the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq. These distinctions are not sufficient in themselves to render an agency action final, however. The cost of administrative proceedings is not viewed as a legal consequence sufficient to satisfy the second prong of the *Bennett* analysis. *See Home Builders Ass'n of Greater Chicago v. U.S. Army Corps of Eng'rs*, 335 F.3d 607, 616 (7th Cir. 2003) ("[T]he mere presence of increased administrative costs is insufficient to establish the finality required for nonstatutory review under the APA."); *see also FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 242 (1980) (noting that complying with administrative proceedings "is different in kind and legal effect from the burdens attending what heretofore has been considered to be final agency action"). Consequently, the additional burden involved in proceeding before the Corps to obtain a final decision on Plaintiff's permit application does not render the EPA's action final under the APA.[8]

---

[8]Plaintiff cites cases in which an agency's determination was deemed to be final because it required the plaintiff to apply for a permit or to undergo additional administrative proceedings. *See Hawkes Co., Inc. v. U.S. Army Corps of Eng'rs*, 782 F.3d 994 (8th Cir. 2015) (Corps' jurisdictional determination that property contained water of the United States required the plaintiff to apply for CWA permit); *HRI, Inc. v. EPA*, 198 F.3d 1224, 1237 (10th Cir. 2000) (EPA's designation of lands as disputed Indian lands required the plaintiff to apply for a permit). *HRI* is distinguishable because the EPA's designation changed the legal regime to which the plaintiff was subject; the plaintiff was
(continued...)

In summary, Plaintiff argues that the EPA's objections have left it with essentially two choices: (1) construct the road and risk enforcement action or (2) go through the "costly, time-consuming, and futile exercise of submitting an entirely new application to the Corps." (Pl.'s Resp. 11.) But Plaintiff was subject to the first consequence even before the EPA issued its objections. There is no question that Plaintiff must obtain a permit in order to complete its construction project; the EPA's objections have not altered that fact. The second consequence is merely a byproduct of the scheme created by Congress to resolve the state's failure to address concerns raised by the EPA in a timely manner. The cost of complying with this scheme is not sufficient to render the EPA's objections to its permit application final and reviewable. Finally, Plaintiff's assertion that an application to the Corps would be "futile" is unsupported, as discussed in Section VI below. Because the EPA's actions do not satisfy either prong of the *Bennett* analysis, they are not reviewable under the APA.

## V. Exception to Finality

In Count II of the complaint, Plaintiff contends that the EPA engaged in *ultra vires* action outside of its delegated authority. Plaintiff asserts that the EPA did not comply with section 404(j), which permits the EPA to raise objections to a state permit that falls "outside

---

[8](...continued)
eligible for a permit exemption until the EPA made its designation. In contrast, Plaintiff was required to obtain a CWA permit even before the EPA issued its objections. *Hawkes* is not persuasive because the plaintiff in that case was required to comply with the CWA before the Corps issued its jurisdictional determination. Moreover, the reasoning in *Hawkes* conflicts with the reasoning of courts in other circuits. *See Belle Co., LLC, v. U.S. Army Corps of Eng'rs*, 761 F.3d 383, 390-94 (5th Cir. 2014) (Corps jurisdictional determination is not a reviewable action); *Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586, 593 (9th Cir. 2008) (same).

the requirements" of section 404 and the 404(b)(1) guidelines. 33 U.S.C. § 1344(j). Plaintiff contends that the EPA raised issues that are matters of discretion for the MDEQ and, thus, are not "requirements" of section 404 or the 404(b) guidelines. In addition, Plaintiff asserts that the EPA failed to list the conditions necessary for issuance of a permit, as required by 33 U.S.C. § 1344(j).  Thus, Plaintiff contends that, even if the EPA's actions are not final and reviewable under 5 U.S.C. § 704, Plaintiff is entitled to review under the exception in *Leedom v. Kyne*, 358 U.S. 184 (1958).

In *Leedom*, the Supreme Court determined that a statutory bar to judicial review would not apply where an agency acted "in excess of its delegated powers and contrary to a specific prohibition" in a statute. *Id.* at 188. The Sixth Circuit "has narrowly interpreted *Leedom* to apply only in 'extreme situations.'" *Friends of Crystal River*, 35 F.3d at 1079 n.13 (quoting *Shawnee Coal Co. v. Andrus*, 661 F.2d 1083, 1093 (6th Cir. 1981)). The *Leedom* exception requires a "readily observable usurpation of power not granted to the agency by Congress"; it is "not automatically invoked whenever a challenge to the scope of an agency's authority is raised." *Shawnee Coal Co.*, 661 F.2d at 1093. "In order to bring a case within the exception, it must be shown that the action of the agency was a patent violation of its authority or that there has been a manifest infringement of substantial rights irremediable by the statutorily prescribed method of review." *Greater Detroit Res. Recovery Auth. v. EPA*, 916 F.2d 317, 323 (6th Cir. 1990).

**1. Failure to list the conditions necessary for a permit.**

Plaintiff's assertion that the EPA failed to list the conditions necessary for a permit

to issue ignores the December 4, 2012, letter from the EPA, which provided a detailed list

of such conditions. (*See* Ex. 39, 12/4/2012 EPA letter, ECF No. 8-7, PageID.1042-44.) For

example, with regard to mitigation of direct impacts, the letter specified, in part:

> The final wetland and stream compensatory mitigation plans must comply with
> the 2008 Federal Mitigation Rule (Compensatory Mitigation for Losses of
> Aquatic Resources; Final Rule). To demonstrate that the proposed stream and
> wetland mitigation will sufficiently compensate for proposed impacts, the
> applicant shall provide the following, prior to permit issuance:
>
> • Identification of a third-party land steward for long-term management of the
> wetland preservation site. The steward shall have land management experience
> managing wetland preservation sites.
>
> • Adaptive and long-term management plans for both stream and wetland
> mitigation that include a monitoring and reporting schedule and funding
> mechanism.
>
> • Measurable performance standards for stream mitigation. For example, for
> the goal of reducing sediment input to a stream, the applicant must specify how
> sediment input will be measured and provide a baseline with which to compare
> pre-mitigation and post-mitigation conditions.
> . . .

(*Id.* at PageID.1042 (footnotes omitted).) Thus, Plaintiff's assertion is not supported by the

record.[9]

_____

[9]Plaintiff focuses on the EPA's objections the *first* revised permit application (*see* Pl.'s Resp.
6), in which the EPA stated that it could not provide conditions necessary for the permit to issue
because Plaintiff had not established that its proposal was the "least environmentally damaging
practical alternative." (Ex. 19, 4/23/2012 EPA letter.) Plaintiff subsequently revised its application
on two additional occasions, causing the EPA to concede that Plaintiff had identified the least
(continued...)

**2. Objections based on impermissible factors.**

Regarding the EPA objections that were allegedly based on factors within the discretion of the state rather than requirements of section 404(b)(1), Plaintiff fails to satisfy the narrow exception provided by *Leedom*. There is no dispute that the EPA has statutory authority to issue objections to a state permit. Nevertheless, Plaintiff contends that the following statements by the EPA in its April 2012 objections are instances where it exceeded its statutory authority: "we remain concerned that the magnitude of the proposed impacts to the relatively un-impacted aquatic resources along the route is significant"; "the proposed compensatory mitigation will not sufficiently compensate for the loss of aquatic resources"; and "EPA has not received adequate plans to minimize impacts or a comprehensive mitigation plan that would sufficiently compensate for unavoidable impacts." (Pl.'s Resp. 29 (quoting 4/23/2012 EPA letter, ECF No. 6-5).) Plaintiff notes that the EPA has authority to object to permit conditions that fall "outside the requirements" of the CWA. 33 U.S.C. § 1344(j). But Plaintiff contends that the phrase "outside the requirements" indicates that Congress intended to limit the EPA's power to object to only certain matters, while leaving the rest to the state's discretion. Plaintiff asserts that "qualitative" and "quantitative" factors, like the adequacy of mitigation plans, or the magnitude of environmental impacts, are not "requirements" of the 404(b) guidelines; rather, they are discretionary factors for the state

---

[9](...continued)
environmentally damaging alternative. Plaintiff does not explain why the EPA's *initial* objections, which were rendered at least partially moot by Plaintiff's revised applications and then superseded by objections issued in December 2012, are the proper subject of review in this matter.

to decide. Consequently, Plaintiff argues that the EPA lacked authority to issue the foregoing objections.

Contrary to Plaintiff's assertion, neither the CWA nor the regulations give exclusive authority or discretion to the state to determine whether any aspect of the CWA or its guidelines have been satisfied. *See* 40 C.F.R. § 233.50(e) (permitting EPA objections based on "*the Regional Administrator's determination* that the proposed permit is . . . outside [the] requirements of the Act, these regulations, or the 404(b)(1) Guidelines.") (emphasis added). Moreover, the guidelines themselves do not distinguish between "requirements" and other factors. Indeed, many of the guidelines are inherently qualitative and/or quantitative. *See, e.g.,* 40 C.F.R. § 230.1 (noting the fundamental precept of the guidelines that the discharge of dredge and fill material not have an "unacceptable" adverse impact); *id.* § 230.5(c), (j) (requiring assessment of "practicable" alternatives and plans to "minimize" the impacts of the discharge); *id.* § 230.10(a), (c)-(d) (prohibiting discharge if there is a "practicable" alternative with a less adverse impact, if the discharge will cause "significant" degradation of the waters of the United States, or if steps have not been taken to "minimize" potential adverse impacts); *id.* § 230.94 (requiring preparation of a mitigation plan "commensurate" with the scale and scope of the impacts). But it does not necessarily follow that they are "discretionary," or that the state has sole authority to determine whether they have been satisfied.

25

Plaintiff's narrow view of the EPA's authority is not supported by the statute as a whole or its legislative history. Section 402 of the CWA uses similar language, stating that the EPA can object to a state permit if it is "outside the guidelines and requirements of this chapter." 33 U.S.C. § 1342(d)(2). But no court has held that this language limits the scope of EPA objections to "qualitative" or "quantitative" factors. Indeed, the Senate Report to the 1977 amendments makes clear that Congress wanted "strong EPA oversight" of state programs, and that "the authority of the [EPA] to assure compliance with guidelines in the issuance and enforcement of permits . . . *is in no way diminished*" by the establishment of a state permit program. S. Rep. No. 95-370, at 73, 78 (1977) (emphasis added), *as reprinted in* 1977 U.S.C.C.A.N. 4326, 4398, 4403. Similarly, the Sixth Circuit has observed:

> Congress has indicated that one purpose of the FWPCA is "to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution . . . ." 33 U.S.C. § 1251(b). However, when enacting the 1977 amendments to the FWPCA, legislators noted that the "EPA has been much too hesitant to take any actions where States have approved permit programs. The result might well be the creation of 'pollution havens' in some of those States which have approved permit programs." S. Rep. No. 95–370, 95th Cong., 1st Sess. 73 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4326, 4398. Thus, while the purpose of both the 1972 and 1977 Acts may have been to encourage states to assume a portion of the burden of pollution management, the 1977 amendments make equally clear that Congress also intended to *expand* federal oversight.

*Friends of Crystal River*, 35 F.3d at 1078 (emphasis added). In short, because the EPA was authorized to object to the proposed permit, and because its objections were based on the guidelines, they were by no means a "patent violation" of the EPA's delegated authority or

a "manifest infringement" of Plaintiff's rights. *Greater Detroit Res. Recovery Auth.*, 916 F.2d at 323. Consequently, *Leedom* does not apply.

### VI. Claim against the Corps

In Count V of the complaint, Plaintiff alleges that the Corps failed to take any action on the permit application that it filed with the MDEQ, which constituted a "constructive denial" of that application. (Compl. ¶ 391.) The Corps "took the position that Plaintiff would need to file an entirely new permit application with the Corps," but Plaintiff declined to file a new application. (*Id.* at ¶¶ 14, 299, 301.) As relief, Plaintiff seeks an order setting aside the "constructive denial" of its application and requiring the Corps to approve the permit. (*Id.* ¶ 398.) Defendants assert that these allegations do not state a viable claim.

> [T]he only agency action that can be compelled under the APA is action legally *required*. This limitation appears in § 706(1)'s authorization for courts to "compel agency action *unlawfully* withheld." (Emphasis added.) . . .
>
> Thus, a claim under [5 U.S.C.] § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*.

*Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63-64 (2004) (footnote omitted).

Section 404 of the CWA provides that, when the state does not submit a revised permit to satisfy the EPA's objections within the requisite time period, "the Secretary *may* issue the permit pursuant to subsection (a) or (e) of this section . . . ." 33 U.S.C. § 1344(j) (emphasis added). This provision indicates the Corps assumes authority to issue the permit; it does not require the Corps to act. Moreover, it refers to subsection (a), which states that

the Corps "may issue permits, after notice and opportunity for public hearings," and that the Corps must publish notice within 15 days after the applicant "submits all the information required to complete an application for a permit under this subsection[.]" 33 U.S.C. § 1344(a). Thus, before the Corps is required to act on an application, the applicant must provide the Corps with all the information required to complete one. *Id.* Notably, subsection (a) applies to all applications for a section 404 permit from the Corps, including those in states where there is no federally-approved state permitting program. Consequently, when read in conjunction with subsection (a), subsection (j) cannot be interpreted as requiring the Corps to act on a permit application submitted to the state.

Corps regulations provide specific requirements for a permit application, including the specific form that must be used in the application, the contents of the application, and the applicable fees. 33 C.F.R. § 325.1. Plaintiff does not allege that it complied with these requirements, and neither the statute nor the regulations provide that an applicant who has submitted an application to the state is exempt from them.

Plaintiff relies on an EPA regulation which states that, when the EPA's objections are not resolved by the state, "the [Corps] shall process the permit application." 40 C.F.R. § 233.50(j). However, this regulation does not specify or mandate any procedure that the Corps must follow when processing permit applications, let alone require that the Corps consider the application submitted to the state. Moreover, the Corps is responsible for adopting its own procedures for processing permit applications; it is not required to follow

28

regulations developed by the EPA. *Cf. Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 273-74 (2009) (delineating EPA and Corps responsibilities for section 404 permits). The Corps has not adopted specific procedures for processing permit applications when authority to issue a section 404 permit transfers from the state to the Corps. Instead, it has decided to follow the same procedures for all such permit applications. *See* 33 C.F.R. § 325.1 (noting that "[t]he processing procedures of this part apply to any Department of the Army (DA) permit"); *see also* 33 C.F.R. § 325.2 (setting forth procedures for processing permit applications).

Practical considerations support the Corps' approach. Although Plaintiff would require the Corps to act as soon as it assumes authority to issue the permit, it cannot do so without knowing which materials are relevant and whether it has received all the necessary information. Even the most recent version of an application submitted to the state may not be relevant. After the EPA issues its objections, the applicant has an opportunity to continue working with the state to resolve them. Substantial changes could be made to the applicant's proposal during that time, and an applicant could decide to submit an application to the Corps that contains these additional revisions. In addition, after permitting authority transfers to the Corps, the applicant could decide to delay its application and make further revisions before seeking a permit from the Corps. If the applicant believes that the EPA's objections are invalid, it could ignore those objections and modify its application accordingly. In Plaintiff's case, it revised its application several times following the EPA's comments and objections.

Even after the EPA objected to Plaintiff's third revised application in December 2012, Plaintiff continued in its attempts to satisfy those objections. The Corps should not be expected to assume that the most recent version of the application that Plaintiff submitted to the state is the relevant application for review, or that the Corps possesses all the relevant information needed to evaluate it.

Plaintiff contends that it should not be required to file an application with the Corps because such an application would be futile. Plaintiff relies on comments that the Corps made to Plaintiff's first revised application in March 2012, in which the Corps questioned the stated purpose of the project and identified other deficiencies. (Compl. ¶¶ 209-11.) Plaintiff asserts that there "is no reason to think the Corps would now reverse course." (Pl.'s Resp. 33.) But Plaintiff revised its application several times after the Corps made comments. There is no reason to think that the same issues would arise for a different application. In any event, Plaintiff's belief that an application would be futile does not excuse it from filing one before seeking judicial review.

Plaintiff also refers to an email from an EPA employee to the Corps, in which the EPA employee stated that it "looks like 'they' want to go to the COE permit for 595, EPA is such a job killer . . . . hope the COE is more reasonable." (Compl. ¶ 15.) Plaintiff contends that this statement is evidence of administrative bias that renders any application to the Corps futile; however, an email sent to the Corps from another agency is not evidence of bias on the part of the Corps.

In short, Plaintiff does not state a claim based on the Corps' failure to act. The Corps was not legally required to act on the application that Plaintiff filed with the state. The Corps did not deny its application, because Plaintiff declined to file one in accordance with the Corps' procedures. If Plaintiff wanted the Corps to make a determination on its request for a permit, it could have filed a proper application.

Moreover, even if Plaintiff stated a valid claim against the Corps, the relief that it requests is not available. Plaintiff asks the Court to have the Corps issue the permit, but the Court does not have authority to do so. The APA "empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing *how* it shall act.'" *Norton*, 542 U.S. at 64 (quoting Attorney General's Manual on the Administrative Procedure Act 108 (1947)). Because Plaintiff claims that the Corps failed to act on its application, the Court can direct the Corps to consider that application; it cannot require the Corps to issue the permit.

## VII.

In summary, Defendants' motion to dismiss will be granted. Plaintiff fails to state a claim against the EPA (and the EPA administrator) because the EPA's actions are not reviewable under the APA. Plaintiff fails to state a claim against the Corps because the Corps was not required to act until Plaintiff filed a proper application with the Corps. Finally,

because the complaint is subject to dismissal for failure to state a claim, Plaintiff's motion

for discovery will be denied as moot.[10]

An order and judgment will be entered consistent with this Opinion.


Dated: May 18, 2016                                    /s/ Robert Holmes Bell
                                                       ROBERT HOLMES BELL
                                                       UNITED STATES DISTRICT JUDGE

---

[10]Plaintiff seeks discovery of information considered by the EPA during its review of Plaintiff's permit application, in order to determine whether the EPA was biased against the application. (Pl.'s Mot. for Limited Discovery 9-10, ECF No. 25.) That information is not relevant to the motion to dismiss.